**AFFIDAVIT**

I, Bridget Ferrell, being duly sworn, hereby depose and state that the following is true to the best of my

information, knowledge and belief:

**INTRODUCTION AND AGENT BACKROUND**

1. I am a United States Postal Inspector with the United States Postal Inspection Service (USPIS), and have

   been since April 2017. I am currently assigned to the External Crimes/Mail Theft team in Denver, CO. As

   part of my duties, I investigate criminal violations relating to the Postal Service, including but not limited

   to violations pertaining to theft or receipt of stolen mail matter, in violation of Title 18, United States Code,

   Section 1708; aggravated identity theft, in violation of Title 18, United States Code, Section 1028A; and

   fraud and related activity in connection with access devices, in violation of Title 18, United States Code,

   Section 1029.  I have received training and instruction in these types of investigations and have had the

   opportunity to participate in investigations relating to these types of offenses.

2. I have successfully completed the Postal Inspector Basic Training Program at the USPIS Career

   Development Unit in Potomac, Maryland where I received training in the areas of mail fraud and various

   types of identity takeover schemes. I am authorized to obtain and execute Federal Arrest and Search

   Warrants. I have a Bachelor of Science degree in Accounting and a Bachelor of Art degree in Criminal

   Justice and prior to my employment with the USPIS, I worked in the financial industry as a forensic

   accountant and an auditor for approximately two years.

3. This affidavit is submitted in support of an application for a search warrant for the following SUBJECT

   DEVICES: 1) Computer, MacBook Pro Model: A1502; serial number C02QJB3GFVH3; 2) Uniden Dash

   Camera serial number: 8S002732; 3) a TomTom GPS Unit C, serial number: GZ3044A01437and the data

   located therein. Your Affiant submits there is probable cause to believe that the SUBJECT DEVICES

   described in Attachment A are or contain evidence, fruit, and instrumentalities of violations; Theft or

   receipt of stolen mail matter, in violation of Title 18, United States Code, Section 1708; aggravated identity

theft, in violation of Title 18, United States Code, Section 1028A; and fraud and related activity in connection with access devices, in violation of Title 18, United States Code, Section 1029 (the "SUBJECT OFFENSES") and that probable cause exists to establish that Cory Allen SNYDER (C. SNYDER) is engaged in the SUBJECT OFFENSES.

4. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES as detailed with particularity are located in the SUBJECT DEVICES described in Attachment A.

5. The information contained within this affidavit is based on my training and experience, my investigation, as well as information related to me by other law enforcement officers, victims, and witnesses.

## IDENTIFICATION OF THE SUBJECT DEVICES TO BE EXAMINED

6. The SUBJECT DEVICES were discovered and recovered when a 2017 red Volkswagen Jetta, CO plate 266 QLV, VIN: 3VWL17AJ2HM380264 (VEHICLE), was repossessed by Select Asset Recovery group on December 28, 2019. Select Asset Recovery group recovered the items and released them to Thomas Snyder (T. SNYDER), the lien holder of the VEHICLE. At the time of the repossession, the VEHICLE had been used exclusively by C. SNYDER, the husband of T. SNYDER. After the VEHICLE was repossessed and the SUBJECT DEVICES discovered within the VEHICLE, T.SNYDER gave the items to his friend, Joel VELOTTA. VELOTTA then provided these items to the USPIS. The SUBJECT DEVICES were placed into evidence.

7. The Subject Devices are currently in the possession of the USPIS, and came into its possession in the following way: U.S. Postal Inspector Grieme picked up the Subject Devices from VELOTTA on January 30, 2019.

8.  Based on my training and experience, I believe the Subject Devices have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Subject Devices first came into the possession of law enforcement on January 30, 2019.

**PROBABLE CAUSE**

**INITIAL INVESTIGATION**

9.  Between November 2018 and the present, the U.S. Postal Inspection Service received approximately 50 reports of mail theft from post office boxes (PO Boxes) that were broken into at Postal facilities throughout the state of Colorado. The majority of the PO Boxes were rented by businesses.

10. United States Postal Service (USPS) clerk Terri Moody, of the Hi-Mar Post Office located in Boulder, Colorado, contacted the USPIS to report multiple PO Boxes pried open and potential mail theft that occurred on November 23, 2018. Interior surveillance video at that location identified a white male, average build, with lighter colored hair, and partially bald. The suspect was wearing a red jacket, red shorts, a white shirt, and brown colored shoes. Surveillance video showed the suspect was in the post office from approximately 4:02 a.m. until 4:15 a.m. When the suspect walked out of the post office, it appeared he had something secreted under his jacket next to his left hip.

11. USPS Postmaster Shana Mansfield, of the Morrison, CO Post Office contacted the USPIS to report multiple PO Boxes pried open and potential mail theft that occurred on November 23, 2018. Interior surveillance video showed the suspect to be the same person in the Hi-Mar Post Office surveillance video. The suspect was a white male, average build, with lighter colored hair, and partially bald. He was wearing the same red jacket, red shorts, a white shirt, and brown colored shoes as seen in the Hi-Mar Post Office surveillance video. The video revealed the suspect used a small tool with a green handle to pry open PO Boxes. The suspect was also seen holding a handful of mail pieces. Surveillance video showed the suspect in the post office from approximately 6:04 a.m. until 6:19 a.m. External surveillance video from the same date revealed the subject departed the post office property at approximately 6:31 a.m. in a 4-door sedan that had bumper tail lights, a shark fin roof antenna, and wheel rims with five spike groups.

12. USPS Postmaster Robert Aldrich, of the Greeley, CO Post Office, contacted the USPIS on behalf of Guttersen & Company LLC, box holder of XX7090, Greeley, CO 80634, to report a PO Box break-in and subsequent fraud. Interior surveillance video confirmed a suspect broke into the PO Boxes late in the evening on December 23, 2018.  The description of the suspect in the Greeley Post Office video is consistent with the male suspect in the video from the Hi-Mar and the Morrison Post Office.

13. After review of the interior surveillance video from the Hi-Mar Post Office, the Morrison Post Office, and the Greeley Post Office, your Affiant determined the break-ins detailed above were committed by the same suspect.

## SUSPECT IDENTIFICATION & BACKGROUND

14. On January 28, 2019, Aurora Police Department (APD) Detective Gerbino contacted the USPIS on a fraud case regarding suspect C. SNYDER. APD contacted USPIS after receiving a report from VELOTTA regarding numerous financial instruments and opened and unopened mail that had been recovered from C. SNYDER's repossessed VEHICLE. The financial instruments and mail did not belong to C. SNYDER.

15. On February 1, 2019, the USPIS conducted a photo identification with T.SNYDER using photos of the suspect from the Hi-Mar, Morrison, and Greeley Post Offices surveillance videos. T. SNYDER positively identified C. SNYDER as the suspect in the Hi-Mar Post Office, the Morrison Post Office, and the Greeley Post Office surveillance videos.

16. C. SNYDER's criminal history dates back over 10 years and reflects prior arrests for a variety of offenses, including, but not limited to, Dangerous Drugs, Possession of Controlled Substances, Theft, and False Information to Law Enforcement. C. SNYDER has an open criminal case out of El Paso County, CO for forgery (2018CR7075). He is also on probation through the 18th Judicial District for theft.

## AURORA POLICE DEPARTMENT REPORT

17. Between January 19, 2019 and January 22, 2019, APD officers spoke with VELOTTA, who was making a report on behalf of her friend, T. SNYDER. She stated that T. SNYDER had a vehicle in his name that was

repossessed. The repossessed VEHICLE was a 2017 red Volkswagen Jetta with CO license plate 266-QLN. T. SNYDER believed several items found inside of the VEHICLE belonged to C. SNYDER. T. SNYDER transferred possession of the items he had found in the repossessed VEHICLE to VELOTTA.

18. VELOTTA stated that C. SNYDER had possession of the VEHICLE for approximately the last six months. Select Asset Recovery Group repossessed the VEHICLE on December 28, 2018, for nonpayment from C. SNYDER.

19. APD recovered several items from VELOTTA that had been located inside of the VEHICLE, including mail and financial instruments. The financial items recovered included numerous credit cards, debit cards, and gift cards that were not associated with T. SNYDER, C. SNYDER or VELOTTA. The names on the cards include various individuals, and the business Lunch Lessons LLC. APD reported the magnetic strips on three of the cards contained no information, which is common for credit cards that have been altered or cloned. This allows stolen account information to be added to the card.

20. Additional items recovered from the VEHICLE included two debit cards in C. SNYDER's name or maiden name, and a social security card in C. SNYDER's name.

21. Other financial instruments collected included blank checks, multiple counterfeit or altered checks, and blank check stock. Additionally, five checks bearing white tape were also located in the VEHICLE. These checks appeared to be used as templates to make check copies. A box indicating it contained 900 personal wallet blank checks item 140-5245 form number 8000 were located in the VEHICLE, as well as other blank check styles and brands. Counterfeit checks printed using the same check stock number 80000 were found in a binder in the VEHICLE.

22. APD also recovered over 20 legitimate business and personal checks that contained PO Box addresses from many cities in Colorado such as Arvada, Aurora, Denver, Eastlake, Greeley, Limon, Longmont, and Sterling. Several opened and unopened mail pieces from different senders and addressed to different PO Boxes across the entire Font Range were also recovered from the VEHICLE.

23. Also inside of the VEHICLE was a handwritten note on blank check paper that read: **"Business opportunities, the wheels have been turning. What if I told you that the style of paper this check stock is printed on is 1 of 7 different styles that I currently have. I have 7 different styles. In addition I have 2 styles of personal check stock, check builder pro software, a laser printer with the correct micr toner needed for check printing so businesses like Walmart can scan the check and it work. I'm missing the business checking accounts needed to move many under the radar. I need a business partner that specifically sets up in business checking accounts remotely. The cut is always 50%. PS Ms. Account and personal info base is plentiful."**

24. APD took possession of some, but not all, of the items that had been in the repossessed VEHICLE, then transferred those items to USPIS between February 25, 2019 and February 28, 2019.

## USPIS REPORT

25. On January 24, 2019, after making a report to APD, VELOTTA reported to USPS Postmaster Sandersfeld that she had additional mail, checks, credit card statements, and electronics from C. SNYDER's repossessed VEHICLE that had not been taken by APD. VELOTTA also stated she had a small pry bar that was found with the mail in the VEHICLE. USPS Postmaster Sandersfeld contacted the USPIS regarding the information she received from VELOTTA.

26. On January 30, 2019, Postal Inspector J. Grieme made contact with VELOTTA at her residence. VELOTTA told Postal Inspector J. Grieme that her friend T. SNYDER, who used to be her neighbor, received bags of items from Select Asset Recovery Group that they retrieved from the repossessed VEHICLE. She said that after T. SNYDER received these items and started going through them, he noticed a lot of mail addressed to various people. VELOTTA said T. SNYDER then transferred control of all of the items to her because he had issues controlling his anxiety and he could not handle dealing with what appeared to be evidence of criminal activity. She stated T. SNYDER gave her verbal consent to do what she deemed necessary with the items. VELOTTA reported that the bags she received from T. SNYDER

contained mail, financial documents, and checks from several cities including Greeley, Limon, Boulder, Lakewood, and a few others from the VEHICLE.

27. On January 30, 2019, Postal Inspector J. Grieme received the following items from VELOTTA that had been in the repossessed VEHICLE: one computer, MacBook Pro Model: A1502; serial number C02QJB3GFVH3, one Uniden Dash Camera Serial Number: 8S002732, one TomTom GPS Unit C NO: GZ3044A01437, one pry bar with a green handle, and miscellaneous opened and unopened mail, including approximately nine pieces of mail containing the recipient name and address of Gutterson & Company, PO BOX 337090, Greeley, CO 80633. One piece of mail contained was addressed to C. SNYDER at 305 N Sable Blvd. #4211.The pry bar with a green handle is consistent with the small green tool seen in the interior surveillance video at the Morrison Post Office.

## T. SNYDER INTERVIEW

28. On February 1, 2019, Inspector B. Ferrell and Inspector J. Grieme met with T. SNYDER regarding his involvement and knowledge of C. SNYDER's activities.

29. T. SNYDER stated his name was on the lease for the VEHICLE that he shared with C. SNYDER. Until approximately June 2018, T. SNYDER made payments for the VEHICLE. Sometime during June of 2018, T. SNYDER served C. SNYDER divorce paperwork and a protection order. Around this time, C. SNYDER left with the VEHICLE and took a MacBook Pro computer. T. SNYDER assumed C. SNYDER would be making payments for the VEHICLE thereafter.

30. In August 2018, Volkswagen contacted T. SNYDER to explain C. SNYDER attempted to make a payment towards the VEHICLE, but the payment did not go through. Volkswagen alerted T. SNYDER that the VEHICLE was behind in payments.

31. On approximately January 15, 2019, T. SNYDER learned the VEHICLE had been repossessed by Select Asset Recovery Group and was located at an impound lot in the Denver area. T. SNYDER was told numerous items were left in the VEHICLE and could only be recovered by T. SNYDER, because his name was on the lease.

32. T. SNYDER was advised he could pick up the items that Select Asset Recovery Group recovered from the VEHICLE. After recovering the items, T. SNYDER discovered mail, checks and other documents containing names and addresses belonging to various individuals. He also picked up a MacBook Pro that was previously T. SNYDER's, a TomTom GPS Unit that T. SNYDER gave to C. SNYDER as a gift during their marriage, a dash camera, tools, and other miscellaneous items.

33. T. SNYDER stated that his Apple account, including the information on the MacBook Pro, were completely wiped by C. SNYDER after the divorce papers were served. T. SNYDER has not had access to the MacBook Pro computer since June 2018.

34. T. SNYDER had his friend, VELOTTA, help him go through the items recovered by Select Asset Recovery group. Once he realized the items were criminal in nature, he gave permission to VELOTTA to report the items to the APD and the USPIS.

35. Postal Inspectors showed T. SNYDER images from the surveillance cameras during the PO Box break-ins at the Hi-Mar Post Office, the Morrison Post Office, and the Greeley Post Office. T. SNYDER positively identified the subject in these photos as C. SNYDER. T. SNYDER was also shown a surveillance image of a vehicle at the Morrison Post Office that drove off the property after the PO Box break-in incident occurred on November 23, 2018. T. SNYDER stated the vehicle in the surveillance image looked similar to the VEHICLE C. SNYDER was driving, which was subsequently repossessed.

## 2017 RED VOLKSWAGON JETTA

36. On February 5, 2019, Inspector B. Ferrell contacted Select Asset Recovery Group regarding C. SNYDER's VEHICLE that was repossessed. Pat Stone, the owner of Select Asset Recovery group confirmed the vehicle was repossessed on December 28, 2018, in a Best Buy parking lot located at 104 W 104th Ave. Northglenn, CO. The VEHICLE was found by the Select Asset Recovery Group's camera cars that drive around looking for vehicles needing to be repossessed. Stone said there was no reported contact with any driver or passengers at the time the VEHICLE was repossessed.

37. Stone stated C. SNYDER attempted to call the Select Asset Recovery Group on January 10, 2019, at approximately 3:06 p.m. C. SNYDER posed as his husband, T. SNYDER, and attempted to recover the VEHICLE, but was denied. C. SNYDER called the Select Asset Recovery Group numerous times after this date and continued to pose as T. SNYDER.

38. Select Asset Recovery Group released the items to T. SNYDER and placed the VEHICLE into auction.

39. Select Asset Recovery Group provided photos of the VEHICLE when it was repossessed. The photos showed a red Volkswagen Jetta, 4-door sedan, with bumper tail lights, a shark fin roof antenna, and wheel rims with five spike groups. The VEHICLE is consistent with the car seen in the exterior surveillance video from the Morrison Post Office.

## VICTIM INTERVEIWS:

### *Guttersen & Company LLC*

40. Between December 10 and 12, 2018, the Weld County Sheriff's Office (WCSO) responded to a fraud report made by L.Y., the CPA and Controller for Guttersen & Company LLC, and the business owners, M.G. and H.G., regarding reported fraudulent activity on their business accounts and the personal financial account for M.G. L.Y. reported that the business's PO Box XXX090 at the Greeley Post Office in Greeley, CO, had been broken into recently. However, she did not know the exact date that the PO Box theft occurred and no police reports were filed documenting the actual mail theft. The fraudulent activity was the result of the original mail theft.

41. L.Y. stated she was contacted by First National Bank, the bank that serves the business's financial accounts, regarding three fraudulent checks associated with the account, where attempts were made to pass those checks.

42. First National Bank advised that on December 7, 2018, an account #XXXXX7731 under Guttersen & Company LLC's name was fraudulently opened. On the same date, an attempt was made to deposit a fraudulent Guttersen & Company LLC check #X110 in the amount of $2,250 into the fraudulent Guttersen

& Company LLC's account. The check was made payable to Jesse RODRIQUEZ. Surveillance images of

the transaction were provided by First National Bank. The surveillance images were compared to a driver's

license photo of RODRIQUEZ. The images were a match.

43. Fraudulent check #X106, in the amount of $4,000, and fraudulent check #X109, in the amount of $1,500,

were both drawn on Guttersen & Company LLC's legitimate bank account and they were both made

payable to Luis Thomes. These checks were electronically deposited into Chase Bank account

#XXXXX2638 and the back of the checks were endorsed with Luis Thome's name.

*M.G.'s personal account*

44. H.G. stated she was contacted by First National Bank, regarding fraudulent checks that were drawn on

M.G.'s legitimate personal bank account with First National Bank.

45. An attempt to deposit fraudulent check #XX83 occurred at a First National Bank location in Broomfield,

CO on December 10, 2018. The check was typed in the amount of $6,800, made payable to Jesse

Rondriquez (SIC). The check contained a personal account number belonging to M.G. First National Bank

provided surveillance images of the subject during the transaction. Your Affiant determined that the subject

was C. SNYDER, using the alias name of RODRIQUEZ.

46. Fraudulent Check #XX58 was electronically deposited from M.G.'s personal account into a Bank of

America account. The check was written in the amount of $1,800, and made payable to Ryan Labonte. The

check contained a personal account number belonging to M.G. and signed with a forged signature of H.G.

47. On December 11, 2018, First Bank in Greeley, CO reported to WCSO Deputies that RODRIQUEZ had

attempted to cash another check at a First National Bank location in Broomfield, CO in the drive-through

on December 10, 2018. The Broomfield Police were called, and RODRIQUEZ was arrested for other

unrelated charges. When the arresting officers questioned RODRIQUEZ, he stated that "Cory", last name

unknown, was the person who gave him the check.

48. On January 3, 2019, L.Y. reported three additional attempts to cash checks associated with M.G.'s personal

account with First National Bank. One check #XX73 was made payable to K.S., in the amount of $1,500,

and the deposit attempt was made at a US Bank location in Thornton, CO. The check did not go through since First National Bank put a freeze on M.G.'s personal account. Attempts to pass the other two checks were made through electronic deposit, but the copies were not legible.

49. WCSO Deputies made contact with M.G. and H.G, the owners of Guttersen & Company LLC. They were shown copies of fraudulent checks #X110, #X106, #X109 and #XX83, and stated the signatures did not belong to either of them. They both stated they do not have employees by the names of C. SNYDER or RODRIQUEZ.

*K.S.*

50. On January 23, 2019, WCSO Deputies made contact with K.S. at her employer's location in Greeley, CO regarding fraudulent check #XX73. When shown a copy of the fraudulent check, K.S. stated she had no knowledge of the check and recently learned she has been a victim of financial fraud. K.S. advised several accounts had been attempted to be, or were, opened fraudulently in her name. All of the fraudulent activity involving her name has legitimate personal identifying information, with the exception of her first name. All the fraudulent activity misspells her first.

51. On February 14, 2019, K.S. was interviewed by Inspector B. Ferrell and WCSO Sgt. K. Schwartz. K.S. provided additional information on the fraudulent activity that occurred on her financial accounts. She advised on January 11, 2019, SunTrust Bank sent her a check addressed to "K.S. (first name misspelled)", PO XXX440 Aurora, CO 80046. K.S. stated she did not open this financial account, her first name was spelled wrong, and she is not the box holder for the PO Box listed on this check.

52. U.S. Postal Inspectors verified the PO Box application for PO Box XXX440 which revealed C. SNYDER was the box holder since November of 2018.

**JESSE RODRIQUEZ INTERVIEW**

53. WCSO issued a warrant for RODRIQUEZ for Forgery (F5) 18-5-102, Criminal Possession of a forged instrument (F6) 18-5-105, and Identity Theft (F4) 18-5-902(1)( b).

54. On January 31, 2019, RODRIQUEZ, who was in custody due to the warrant, was interviewed by WCSO on charges related to the negotiation of fraudulent check #X110. He waived *Miranda*, and agreed to speak with the WCSO Deputies.

55. RODRIQUEZ was shown check #X110 written out to him, containing the Guttersen & Company LLC's account information with a forged signature. Surveillance photos of a subject standing at the counter inside of First National Bank depositing the check were also shown. RODRIQUEZ stated the picture was from the day he opened the account. RODRIQUEZ stated a guy named "Cory," last name unknown, wrote the check from the Guttersen & Company LLC's account and gave it to him to deposit. He denied knowing how "Cory" came into possession of the check. RODRIQUEZ stated he thought it was for landscaping for Guttersen & Company LLC, but advised he does not know M.G. or H.G.

56. RODRIQUEZ was shown a surveillance photo of a male depositing fraudulent check #XX83 for $6,800 into the Guttersen & Company LLC's account. He identified the male as "Cory," last name unknown, the same "Cory" involved in check # X110 and also the person who gave him check XX83 to deposit. Your Affiant confirmed that the individual identified by RODRIQUEZ as "Cory" and shown in the surveillance video provided by First National Bank of the individual who deposited this check was physically consistent with the photo from C. SNYDER's driver's license.

57. RODRIQUEZ stated he's known "Cory" for four years and contacts him through Facebook. He described him as a white male, 6'2", and kind of heavy set. When he was provided a computer under the WCSO Deputies supervision, he found and identified a Facebook profile containing the name Cory Snyder. This is the person RODRIQUEZ identified as "Cory" in paragraph 56. WCSO deputies confirmed that the name and picture of the profile was consistent with C. SNYDER's driver's license.

58. RODRIQUEZ claimed he has a business relationship with C. SNYDER. Specifically, RODRIGUEZ claimed that C. SNYDER acted as a liaison to provide RODRIGUEZ with landscaping jobs for other people. RODRIQUEZ stated that C. SNYDER would provide RODRIQUEZ with checks for payments for these landscaping jobs. RODRIGUEZ said that the checks came from the employers who were supposedly

hiring RODRIGUEZ for these landscaping jobs, although RODRIGUEZ did not have direct contact with the supposed employers and the employees never provided RODRIGUEZ with the checks directly.

59. RODRIQUEZ stated he does not know all of the computer stuff C. SNYDER does or the different programs he uses, but the checks RODRIQUEZ receives from C. SNYDER are always filled out. On one occasion when C. SNYDER was at RODRIQUEZ's house, he saw him use a gray MacBook Pro computer and he also had a little black Canon printer in his possession. RODRIQUEZ alluded to C. SNYDER using his MacBook Pro computer and printer to create the filled out checks that C. SNYDER gave RODRIQUEZ. The gray MacBook Pro computer RODRIQUEZ described matches the gray MacBook Pro computer that was seized from the VEHICLE. RODRIQUEZ stated C. SNYDER's VEHICLE was repossessed so C. SNYDER is not mobile right now. RODRIQUEZ believes C. SNYDER lives somewhere in Aurora.

## SUMMARY OF SUBJECT DEVICES TO BE SEARCHED

60. Based on my knowledge, experience, and training, counterfeit financial transactions devices and counterfeit identifications are easily created with various electronic devices, such as computers, mobile phones, cameras, scanners, and printers. I know that co-conspirators involved in fraud-related offenses also often share electronic devices to further their criminal conspiracy. Suspects involved in this type of criminal activity commonly utilize commercially available computer programs, such as Versacheck, to enter stolen bank account information. The suspects then use printers to create the counterfeit checks containing victims' bank account information. These devices are also used to create counterfeit identifications, which often depict photographs of the suspects with other people's personal identifying information. These counterfeit identifications are used to conduct the fraudulent transactions at merchant locations. I also know based on my training and experience that persons engaged in fraud-related offenses often use the Internet to further their criminal conspiracy. I know that electronic devices are also used to research and obtain additional personal identifying information on victims, including credit information.

61. The MacBook Pro computer device to be searched was located in the VEHICLE at the time it was repossessed. T. SNYDER stated that C. SNYDER has been in possession of the MacBook Pro since June 2018. RODRIGUEZ also stated he saw C. SNYDER use a MacBook that matches the description of the one found in the repossessed VEHICLE. The MacBook Pro computer device may contain evidence, fruits, and instrumentalities of violations pertaining to theft or receipt of stolen mail matter, in violation of Title 18, United States Code, Section 1708; aggravated identity theft, in violation of Title 18, United States Code, Section 1028A; and fraud and related activity in connection with access devices, in violation of Title 18, United States Code, Section 1029, including stolen financial account information, victims personal identifying information, counterfeit identifications, internet search history, and check writing software.

62. Based on my knowledge, experience, and training, dash cameras are designed to record the travel of a vehicle. The dual lens Uniden Dash Camera device to be searched was located in the VEHICLE at the time it was repossessed. The dual lens allows the camera to record audio and record video of 120 degrees wide-angle view. The Uniden Dash Camera device may contain evidence, fruits, and instrumentalities of violations pertaining to theft or receipt of stolen mail matter, in violation of Title 18, United States Code, Section 1708; aggravated identity theft, in violation of Title 18, United States Code, Section 1028A; and fraud and related activity in connection with access devices, in violation of Title 18, United States Code, Section 1029, including video or audio of suspects or co-conspirators engaged in criminal activity, images of stolen mail or financial information stolen from the mail, and the locations visited by the suspect such as the post offices affected by the PO Boxes being broken into throughout Colorado.

63. Based on my knowledge, experience, and training, GPS navigation devices are often able to retain data input by the user, as well as historical location information that is retained by the device software. These devices are also able to locate and suggest possible areas of interest to the user, such as Post Offices. Open-source manuals available for the TomTom Start device note this device has a "Recent Destination" feature that allows for the device to automatically record previous location history. The device also has features that allow it to be connected via Internet to a cellular telephone for purposes of making phone calls and

sharing location and destination information. The device can also accept portable media storage, such as an SD card, which can be shared with other devices, such as the MacBook Pro computer referenced in this affidavit.

64. The PO Box break-ins occurred in a wide geographic area including Limon, Sterling, Denver Metro Area, Greeley, Castle Rock, among others. The TomTom GPS device would facilitate travel to these locations and was located inside of the VEHICLE. The VEHICLE was seen in surveillance video at the Morrison Post Office. According to T. SNYDER, the GPS device belonged to C. SNYDER. The TomTom GPS device may contain evidence, fruits, and instrumentalities of violations pertaining to theft or receipt of stolen mail matter, in violation of Title 18, United States Code, Section 1708; aggravated identity theft, in violation of Title 18, United States Code, Section 1028A; and fraud and related activity in connection with access devices, in violation of Title 18, United States Code, Section 1029, including historical location information and recent destination information related to the post office break-ins that occurred throughout Colorado.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

65. Based on my training and experience, your Affiant knows the following about the SUBJECT DEVICES:

66. A GPS navigation device uses the Global Positional System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. There signals are sent by radio, using specifications that are publically available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes

altitude with a high level of precision. Some GPS devices have Bluetooth capability to connect to user's smartphones.

67. A hard disk drive ("HDD"), also known as a hard drive or hard disk, is a data storage device that consists of an external circuit board, external data, power connections, and internal glass, ceramic, or magnetically charged rotating metal platters that permanently store data even when powered off.  A solid-state drive ("SSD"), also known as a solid-state disk, is a data storage device that uses integrated circuit assemblies as memory to permanently store data instead of using rotating platters.  Flash drives, flash cards, and thumb drives are digital storage devices that can connect to computers or other devices using the appropriate connection.  CDs/DVDs are digital storage devices capable of storing large amounts of digital data—a user can store information onto a CD/DVD by "burning" digital data to the device using a computer CD/DVD drive.  These devices are capable of storing any electronic information including images, videos, word processing documents, programs and software, and web pages.

68. "Computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, USB storage devices, RAM, floppy disks, thumb drives, flash memory, CDs, DVDs, digital cameras, SD cards, digital scanners, and other magnetic or optical storage media.

69. Based on my knowledge, training, and experience, I know that computers and digital storage devices can store information for long periods of time.  Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensic tools.

70. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

71. There is probable cause to believe that things that were once stored on the Subject Devices may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap," "recovery," or "shadow copy" file.

   c. Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this

evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

72. *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the SUBJECT DEVICES that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICES were used, the purpose of the use, who used the SUBJECT DEVICES, and when.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.

g.  Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image

file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

h.   A single compact disk can store dozens of images and hundreds of pages of text.  The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years.  Thumb drives with a capacity of 32 gigabytes are not uncommon.  Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon.  These drives can store thousands of images and videos at very high resolution. Magnetic storage located in host computers adds another dimension to the equation.  It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country.  Once this is done, there is no readily apparent evidence at the "scene of the crime".  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

73. *Need to review evidence over time and to maintain entirety of evidence.*  Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and

the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

74. *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the SUBJECT DEVICES consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the SUBJECT DEVICES or information from a copy of the SUBJECT DEVICES consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of

the SUBJECT DEVICES to human inspection in order to determine whether it is evidence described by the warrant.

## **CONCLUSION**

75. Based on the investigation described above, probable cause exists to believe that the SUBJECT DEVICES (described in Attachment A), contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1708, 1028A, and 1029 (described in Attachment B).  I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

_/s Bridget Ferrell_ _____

**Bridget Ferrell, Postal Inspector**

**United States Postal Inspection**

**Service**

Submitted, attested to, and acknowledged by reliable electronic means on this the 18th day of March, 2019.

_____

HON.

UNITED STATES MAGISTRATE JUDGE

DISTRICT OF COLORADO

**Affidavit reviewed and submitted by Kelly Winslow, Assistant United States Attorney.**